STATE of Delaware ex rel. David P.
BUCKSON, Attorney General,
Plaintiff Below, Appellant,

v.

The PENNSYLVANIA RAILROAD COMPA-
NY, a corporation of the Commonwealth
of Pennsylvania, whose name has been
changed by merger to Pennsylvania New
York Central Transportation Company, a
corporation of the Commonwealth of Penn-
sylvania, Defendant Below, Appellee.

Supreme Court of Delaware.

Oct. 31, 1969.

David P. Buckson, Atty. Gen., Dover, Ruth M. Ferrell, State Solicitor, Wilmington, William Prickett, Jr., and Rodman Ward, Jr., Sp. Deputy Attys. Gen., Wilmington, and William L. Griffin, Washington, D. C., for plaintiff below, appellant.

Blaine T. Phillips, of Potter, Anderson & Corroon, Wilmington, for defendant below, appellee.

WOLCOTT, Chief Justice, and CAREY and HERRMANN, JJ., sitting.

HERRMANN, Justice:

This appeal involves the title and related rights regarding a strip of land lying along the westerly or Delaware side of the Delaware River between high and low water marks, known as the foreshore, located between Edgemoor and Claymont.

The area is claimed both by the State and The Pennsylvania Railroad Company [1] (hereinafter the "Railroad"). The State brought a declaratory judgment action to determine the title and rights in controversy.

I.

The State claims that upon the separation of the colonies from England, Delaware acquired (except to the extent William Penn or his successors or agents had previously conveyed away) the title to all lands situate within the 12 mile circle of New Castle, including the Delaware River and subaqueous soil thereunder to the low water mark on the New Jersey side. This claim includes the lands situate easterly of the natural high water mark and westerly of the natural low water mark of the Delaware River on the Delaware side, comprising the foreshore here in question. The State claims that the Railroad is occupying such foreshore, asserting title to it, and placing fill thereupon wrongfully.

The Railroad denies the State's title to the foreshore in question. The Railroad admits its occupancy of the area and admits that, under a permit issued by the U. S. Corps of Engineers, it has constructed dikes and filled portions of the foreshore westerly of the low water mark, commencing in 1946.

On the Railroad's motion for summary judgment, the Trial Court ruled in an opinion reported at Del.Super., 228 A.2d 587: (1) that the Railroad has the rights of a riparian owner; (2) that as such, the Railroad holds title to mean low water mark and therefore its title includes the foreshore; (3) that the Railroad's right to fill the foreshore is not limited by any public right to navigate or fish in the waters thereof. As a result of further proceedings, the Trial Court ruled additionally, by

1. The name of the Company has been changed subsequently to Pennsylvania New York Central Transportation Company, a corporation of the Commonwealth of Pennsylvania. The Railroad claims by

virtue of a 999 year lease from Philadelphia, Baltimore and Washington Railroad Company. All these interests are referred to herein as "the Railroad".

opinion reported at Del.Super., 237 A.2d 579: (4) that while the State may have the police power to regulate the use of the foreshore for purposes other than fishing and navigation, such power has not been exercised so as to preclude the Railroad from filling the foreshore. Finding two issues of material fact in dispute which could not be resolved properly without trial, the Trial Court denied the Railroad's motion for summary judgment. After final hearing, the Trial Court ruled, by opinion reported at Del.Super., 244 A.2d 80: (5) that in order to determine whether the Railroad confined the filling operation to its own foreshore property, a determination is required regarding the location of the controlling mean low water line; (6) that for the purposes of this action, the proper and practical solution for determining the location of that line is to use the mean low water line surveyed and determined in 1967; (7) that the Railroad has not filled in the River beyond the mean low water line as it existed at the time of the 1967 surveys; and (8) that, accordingly, the Railroad may not be disturbed in its present use of the foreshore. The State appeals.

## II.

The relevant facts, including the extensive record title of the property involved, are spelled out carefully and at length in the opinion of the Trial Court reported at 228 A.2d 587, 590–594. Reference is made thereto; no useful purpose would be served by a repetition here.

## III.

Since the Railroad's position is based upon the rights it asserts as a riparian owner, the first question for review is whether it is a riparian owner. The Trial Court dealt with that question, including the arguments the State now renews before us, at 228 A.2d 594–596. After consideration of the State's contentions, we affirm the findings and conclusions of the Trial Court on this point there appearing.

## IV.

The fundamental question raised on this appeal is whether, under the law of this State, a riparian owner holds title to the low water mark of a navigable river and, therefore, holds the foreshore lying between the line of high tide and the line of low tide. The Trial Court discussed this question at length [228 A.2d 596–600] and concluded that in Delaware a riparian owner of land fronting on navigable water holds title to the low water mark and, therefore, owns the foreshore. We agree.

This rule of property has prevailed under the decisional law of this State, uncriticized and unchallenged, for more than a century.

In 1851, in Bickel v. Polk, 5 Harr. 325, Chief Justice Booth, speaking for the Delaware Superior Court, recognized that the title of an owner of land adjoining tide water "runs to low water mark." Three years later, the Delaware Court of General Sessions stated in State v. Reybold, 5 Harr. 484 (1854), that "a riparian proprietor, or owner of land fronting on a navigable river, holds to the law water mark." And in 1882, in Harlan & Hollingsworth Co. v. Paschall, 5 Del.Ch. 435, 453, the Chancellor of Delaware stated:

> "Whatever the common law of England might have been, or is now, whatever the law of other States may be, on this subject, I feel bound to recognize as true * * * the law decided by our own law courts, that a riparian proprietor or owner of land fronting upon a navigable river holds to the low water mark."

These early decisions of the various Trial Courts of our State have been neither criticized in any later decision nor challenged by appeal over the years, with the result that this Court has not been called upon heretofore to rule upon the question. Apparently, this rule of property has been deemed settled beyond question until this litigation.

The extent to which the rule has been considered settled in this State is reflected in the landmark case of New Jersey v. Delaware, 291 U.S. 361, 375, 54 S.Ct. 407, 412, 78 L.Ed. 847 (1934), where the United States Supreme Court, relying upon *Reybold* and *Harlan* cited to it by Delaware's Attorney General, recognized that "* * * in Delaware, unlike New Jersey, title to the foreshore is in the riparian proprietor." Indeed, in that case, the State of Delaware took a position directly opposed to that taken by the State here. There, in 1934, the Attorney General's brief advised the United States Supreme Court:

> "Plaintiff's [New Jersey's] argument seems to be as follows: The sovereign owns the foreshore, i. e., the strip of land between high water mark and low water mark. No structure can be erected on the foreshore or indeed on the subaqueous soil beneath the tidal waters without the consent of the sovereign.

> "This was the law of England but, as plaintiff has shown, it was never the law of the American Colonies and was never the law of the Colony or State of Delaware. In New Jersey the common law rule that the State owns the foreshore has always been followed, i. e., the riparian owner owns only to the high water mark. In Delaware, however, the riparian owner holds to low water mark. Harlan & Hollingsworth v. Paschall, 5 Del.Ch. 435; State v. Reybold, 5 Harr. 484, 486."

■ The Railroad contends that the doctrine of *stare decisis* impels us to adopt the rule of *Bickel, Reybold,* and *Harlan.* *Stare decisis,* however, has little application in the review of decisions of lower courts by an appellate court, unless the ef-

fect of an overruling would be to import an innovation into established commercial usage or property law. American Ins. Co. v. Iaconi, 8 Terry 167, 89 A.2d 141 (1952). We are impelled to endorse the rule of the cited cases because it has become a recognized rule of property, long adhered to in this State, affecting land transactions and land titles for over a century. The rule has been accepted by the Bar and Bench of this State, without criticism or challenge, and extensive property rights and land titles have been settled in dependence upon it. Moreover, the General Assembly has not seen fit to change this rule of property, though last reiterated in *Harlan* as long ago as 1882.

■ This Court is not now free to disturb the time-honored rule of property here under attack; and this would be so even if the State's argument were more persuasive and its conclusions more logical than is the case. Rules of property, established by decisional law and long acquiesced in, may not be overthrown by the courts except for compelling reasons of public policy or imperative demands of justice. Courts must avoid unsettling judge-made rules affecting the devolution of property, in the absence of a strong requisite public policy. See Abbott Supply Company v. Shockley, 11 Terry 261, 128 A.2d 794, 798 (1956), aff'd. 11 Terry 510, 135 A.2d 607 (1957).

■ The State attempts to demonstrate that the rule announced in *Bickel, Reybold,* and *Harlan* is dictum; that it is historically and legally contrary to the common law of England and colonial Delaware;[2] and that it is not the majority rule prevailing elsewhere.[3] We do not enter into a discus-

---

2. The State relies upon Bailey v. Philadelphia, Wilmington and Baltimore Railroad Company, 4 Harr. 389 (Ct.Err. & App., 1846), in this connection, to demonstrate the error of *Bickel* and its offspring. The *Bailey* case is distinguishable in that it involved the right to water flow and not to foreshore.

3. The wide divergence of authority is demonstrated by the rules prevailing in our neighboring jurisdictions. In Pennsylvania, a riparian owner holds to the low water mark. See Black v. American International Corp., 264 Pa. 260, 107 A. 737 (1919). In New Jersey, a riparian owner holds to the high water mark. See O'Neill

sion of these interesting historical and legal questions. Assuming, *arguendo*, that the State's contentions are technically and historically correct, our conclusion is unchanged. Dictum or not, historically correct or not, majority rule or not, the rule announced by *Harlan* and its progenitors has ripened into a settled rule of property in this State which may not be disturbed by the courts. We find no public policy or demand of justice requiring this Court to abandon the recognized rule of property here under scrutiny. Indeed, if we consider the confusion and chaotic effect upon land titles which would follow an abrupt abandonment of the prevailing rule, it may be said that public policy and the demands of justice compel preservation of the existing rule. If there is to be a change, it must be accomplished by the General Assembly with due regard for the law of eminent domain. Compare Abbott Supply Company v. Shockley, 11 Terry 261, 128 A.2d 794, 798 (1956).

The State points to certain Delaware statutes and "executive practice" as being inconsonant with the *Harlan* rule. These were considered and discussed by the Trial Court at 228 A.2d 598–599. We agree with the conclusions there expressed. In the final analysis, for more than a century the General Assembly has permitted the rule here involved to remain the law without change. This, we think, is indicative of a public policy consistent only with the continuance of that rule.

■ Accordingly, we hold it to be the law of this State that a riparian owner of land fronting upon a navigable river holds title to the low water mark. It follows that the Railroad holds title to the foreshore here in controversy.

v. State Highway Department, 50 N.J. 307, 235 A.2d 1 (1967). Maryland agrees with New Jersey. See Hess v. Muir, 65 Md. 586, 5 A. 540, 6 A. 673 (1886). See generally, Shively v. Bowlby, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331 (1894).

## V.

The State raises for review the Trial Court's delimitation of the boundary between the property of the State and that of the Railroad. The Trial Court held that the low water mark to which the Railroad's title runs is "mean low water mark", being "the average daily height of all low water marks over a twenty-three year period beginning January 1, 1942." See 228 A.2d 587, 600–601.

The main thrust of the State's argument in this phase of the appeal is that, by reason of the doctrine of accretion and erosion, a property boundary set by a tide line is a shifting one; that the Trial Court erred in disregarding that concept when it said that, in the view it took of the case, the law of shifting boundaries is "without legal relevancy" in this case. See 244 A.2d 80, 82.

■■ We find no error in this connection. The Trial Court did not state that the shifting boundary principle is not applicable in a Delaware case; indeed, the Trial Court stated that mean low water mark "is a 'shifting' line—it moves." 244 A.2d 80, 81. The Trial Court stated that, for the reasons carefully set forth in its opinion, the shifting boundary principle has no applicability in the demarcation phase[4] of this case. Upon examination of the Trial Court's rationale [244 A.2d 80, 82–83], we approve its findings and conclusions in this connection.

## VI.

Finally, the State contends that, regardless of ownership, the State has the power to regulate the use of the foreshore here involved so as to prohibit the fill thereof by the Railroad, and that it has exercised that power by virtue of certain specified statutes.

4. "Demarcation" is defined as the marking of a boundary line on the ground by physical means or a cartographic representation. "Delimitation" is the defining of a boundary line in written or verbal terms.

These aspects of the case were dealt with at length by the Trial Court in its opinion at 228 A.2d 587, 601–605 and 237 A.2d 580–583. After due consideration of the State's arguments, we agree with the conclusions there stated.

■ The Trial Court there discussed the various statutes cited to us by the State, except 23 Del.C. § 1707 and 7 Del.C. §§ 6402 and 6451, as the exercise by the State of its power to govern the foreshore so as to prohibit the Railroad's filling program. We concur in the Trial Court's views as to the statutes it discussed. As to the statutes not discussed in the opinions below: 23 Del.C. § 1707, pertaining to the removal of sand, is limited by its express terms to beach areas along the Delaware Bay and Atlantic Ocean. And 7 Del.C. §§ 6402 and 6451, dealing with mineral rights in submerged tidelands and with subaqueous lands, are manifestly inapplicable because they expressly relate to State-owned property only.

In connection with this facet of the appeal, the State contends that both the permit issued by the U.S. Corps of Engineers [5] and the case of Cummings v. Chicago, 188 U.S. 410, 23 S.Ct. 472, 47 L. Ed. 525 (1903) indicate that the Railroad was obliged to obtain the State's prior consent as well as that of the Federal Government before proceeding with the fill of the foreshore. Because the opinions below contain no mention of the *Cummings* case, we take note of it here:

First, it is noteworthy that this contention comes before this Court, for the first time, more than three decades after the fill of this foreshore was commenced. The tardiness of the State's assumption of this position reflects unfavorably upon its confidence therein.

The *Cummings* case, involving the construction of a Chicago dock into the Calumet River, is to be distinguished upon at least three grounds: (1) the river there involved was wholly within the territorial limits of the State of Illinois; (2) there was a police-power statute requiring the permission of a Department of Public Works of the City of Chicago as a condition precedent to the construction of any dock within the City; and (3) the dock was being constructed on public land.

■ In view of the absence of any Delaware statute enacted in the exercise of the police power, requiring the State's prior assent to the Railroad's dike and fill program, such prior assent was not necessary by virtue of the *Cummings* case or otherwise. If the General Assembly wishes to control such development in the future by requiring prior permission, it must do so by legislation duly enacted in the proper exercise of the police power of the State. Compare 228 A.2d 587, 602.

Closely related to this point is the State's common law trust concept of control and its reliance upon Black v. American International Corp., 264 Pa. 260, 107 A. 737 (1919), containing dictum to the effect that a riparian owner may not put obstructions between high and low water marks without express authority from the State. We agree with the Trial Court's analysis of the *Black* case [237 A.2d 579, 582–583] and its conclusion that prior permission from the State was not required by virtue thereof.

We find no error in the proceedings below. The judgment of the Superior Court is affirmed.

---

5. The 1946 permit issued by the U. S. Corps of Engineers to the Railroad, authorizing it to fill the foreshore, contained the following proviso:

"It is to be understood that this instrument does not give any property rights either in real estate or material, or any exclusive privileges; and that it does not authorize any injury to private property or invasion of private rights, or any infringment of Federal, State, or local laws or regulations, nor does it obviate the necessity of obtaining State assent to the work authorized. IT MERELY EXPRESSES THE ASSENT OF THE FEDERAL GOVERNMENT SO FAR AS CONCERNS THE PUBLIC RIGHTS OF NAVIGATION. (See Cummings v. Chicago, 188 U.S. 410 [23 S.Ct. 472, 47 L.Ed. 525].)"