**STATE of Delaware, ex rel. David P. BUCK-SON, Attorney General, Plaintiff below, Appellant,**

v.

**The PENNSYLVANIA RAILROAD COMPANY, a corporation of the Commonwealth of Pennsylvania, whose name has been changed by merger to Pennsylvania New York Central Transportation Company, a corporation of the Commonwealth of Pennsylvania, Defendant below, Appellee.**

Supreme Court of Delaware.

Jan. 7, 1971.

David P. Buckson, Atty. Gen., Dover; Ruth M. Ferrell, State Sol., Wilmington; William Prickett and Rodman Ward, Jr., Sp. Deputy Attys. Gen., Wilmington, and William L. Griffin, Washington, D. C., for appellant.

Blaine T. Phillips of Potter, Anderson & Corroon, Wilmington, for appellee.

WOLCOTT, C. J., and CAREY and HERRMANN, JJ., sitting.

WOLCOTT, Chief Justice (for the Majority of the Court):

This supplements our prior opinion in this cause appearing at 267 A.2d 455 to which reference is made for background of this appeal. There, *inter alia,* we affirmed the holding of the Superior Court that the Pennsylvania Railroad Company (now known as the Penn Central Transportation Company) holds title to the foreshore, being the strip of land lying along the westerly or Delaware side of the Delaware River between high and low watermarks between Edgemoor and Claymont. The area was claimed by both the State and the Railroad; and the Railroad prevailed at the delimitation[1] stage of the case by the decision that it holds riparian title down to the easterly mean low water line (MLW).[2] See 228 A.2d 587, aff'd 267 A.2d 455. The demarcation stage had been postponed, upon motion of the State, until after decision upon delimitation had been reached.

We now have for disposition the remaining questions in the cause involving the demarcation of the MLW, and did the Railroad confine its filling operation to its own foreshore property?

The opinion of the Superior Court upon this facet of the case appears at 244 A.2d 80, to which reference is made for a complete factual statement. The Superior Court there held that the only proper and practical solution for determining the location of the controlling MLW is to use a survey made in 1967; and that the Railroad has not filled in the River beyond the MLW as it is shown to have existed by the 1967 survey. The State's appeal from those conclusions is now before us for disposition.

In the record before us there are three surveys concerning the MLW of this particular stretch of the Delaware shore of the River. The first two, those of 1942 and 1954, were made by the Army Corps of Engineers for dredging purposes. As such, they are not suitable for the purpose of fixing a MLW since they consist of soundings taken 1000 feet apart requiring interpolation and extrapolation on a chart drawn to a scale of 800 feet to the inch in order to draw a freehand MLW. The Su-

---

1. "Delimitation" is the legal definition of a boundary line. "Demarcation" is the marking of the legally defined boundary line on the ground by physical means or a cartographic representation.

2. The low water line is an imaginary line formed by the intersection of the foreshore and the plane of average low tide. Mean low water is defined as being "the average daily height of all low water marks over a twenty-three year period beginning January 1, 1942." See 228 A.2d 587, 600–601.

perior Court held that these two surveys were inadequate to accurately demarcate the MLW of 1964, the year in which the filling operation commenced in Area 4, the only portion of the foreshore now in controversy. We agree with this holding for the reasons which appear in the opinion below at 244 A.2d 82–83.

■ This holding left solely the survey of 1967, the year after the filling operation in Area 4 ceased, as the only evidence before the court as to the MLW. This being so, the court accepted this survey as establishing the MLW, and held that the State had failed to sustain its burden of proof that Penn Central's fill had extended beyond the MLW. We affirm this ruling for the reasons appearing at 244 A.2d 84.

■ The State has moved for a remand of the cause to permit geological examinations of core drillings through the existing fill to the elevation of the 1964 MLW in order to definitely establish that line. Apparently this is a possible feasible method. See Cedar Rapids v. Marshall, 199 Iowa 1262, 203 N.W. 932 (Iowa 1925); United States v. Cline, 388 F.2d 294 (4th Cir. 1968); Hawkins v. Alaska Freight Lines, 410 P.2d 992 (Alaska 1966).

However, we think the State's application comes too late. Several reasons force this conclusion. In 1964, when the probably costly filling operation commenced, the State could have had the MLW definitely established by a survey. It did not. It could have had the core drilling performed in preparation for trial of the action instituted by it in 1965. It did not. Nor did it even suggest the feasibility of such a study in the court below.

Furthermore, the application is made five years after the commencement of the litigation, and two years after final judgment in which the State was held not to have discharged its burden of proof. Also, even at this late date, the State does not say positively that it will spend the money necessary to have the core drillings com-

pleted. The most it says is that it probably will.

In any event, we think litigation must someday come to an end. It comes with poor grace for the State, at this late date, to ask leave to do that which it could have done five years ago to sustain its burden. To grant the application would mean a further material extension of the time of ending this litigation.

The judgment below is affirmed.

HERRMANN, Justice (dissenting):

I agree with the State's contention that the 1967 survey and the 1967 MLW are irrelevant to the demarcation issue before us for decision.

The law of the case is that the Railroad holds title to the natural mean low water line; i. e., the MLW as it existed before the filling operation was commenced. See 267 A.2d 455, 459. The 1967 survey shows an artificial mean low water line; i. e., the MLW as it existed after the filling operation. That line, in my opinion, is irrelevant.

The filling of the foreshore was carried on by the Railroad during the period 1956 to 1966. The latest available survey of the natural MLW, as it existed before the filling was commenced in 1956, is the Army Engineers' Survey of 1954. The 1967 Survey, on the other hand, shows an artificial MLW lying on the face of the fill after the fill covered the natural MLW. Therefore, it was error, in my opinion, to decide the demarcation issue on the basis of the 1967 Survey and the 1967 MLW.

The Army Engineers' 1954 Survey thus remains the best evidence of which this case is susceptible as to the true location of the natural boundary prior to the filling operation. Obviously, for the reasons stated by the Superior Court (244 A.2d 80, 83), the 1954 Survey leaves much to be desired in the way of accuracy and adequacy for present purposes. But, under the evidence, it appears reasonably usable for the

determination of the 1954 MLW. It appears that the 1954 Survey was prepared by the same procedures, the same methods of sounding, the same scale, and the same methods of position points as was the 1942 Army Engineers' Survey. The 1942 Survey was utilized by the Railroad in all of its filling operations from 1956 through 1966. Since the Railroad was able to proceed with its filling operations on the basis of the 1942 Survey, and since the 1954 Survey was prepared in the same way and by the same methods, it would seem that the 1954 Survey should be usable for present purposes with a reasonable degree of accuracy. The State's expert witness so testified.

For these reasons, I would reverse and remand on the ground of irrelevancy of the 1967 Survey and the 1967 MLW, with instructions that the 1954 Survey be used to determine the issue of demarcation, if reasonably possible; but that if the probative value of the 1954 Survey is found to be wholly insufficient, then the State's request for opportunity to develop better evidence, by core drillings through the existing fill to the elevation of the natural MLW, be granted.