**UNITED STATES of America,**
**Plaintiff,**

v.

**1,629.6 ACRES OF LAND, MORE OR LESS, IN the COUNTY OF SUSSEX, STATE OF DELAWARE, the Island Farm, Inc., et al., Defendants.**

**Civ. A. No. 3532.**

United States District Court,
D. Delaware.

Dec. 3, 1971.

F. L. Peter Stone, U. S. Atty., Wilmington, Del., Charles F. MacMullan and Harry W. McKee, Attys. Department of

Justice, Washington, D. C., for the United States of America.

James M. Tunnell, Jr., of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., Ralph J. Luttrell, Washington, D. C., of counsel, for defendant, The Island Farm, Inc.

H. James Conaway, Jr., Jack B. Jacobs and Doris M. Toll, of Young, Conaway, Stargatt & Taylor, Wilmington, Del., for defendant, Jennie H. J. Layton.

## OPINION

CALEB M. WRIGHT, Chief Judge.

The United States of America (Government) commenced this suit in eminent domain to condemn 1,629.6 acres of land in Sussex County. The initial complaint named as defendant The Island Farm, Inc. (Island Farm), and was subsequently amended to include as an additional defendant Jennie H. J. Layton (Layton).

Since the Government has possession of the land, the remaining consideration is to establish just compensation. The Court previously granted the motion of Island Farm requesting that a commission be appointed to determine the value of the condemned land.[1]

Prior to the designation of the commission and pursuant to an evidenced conflict concerning title to a segment of the condemned land, the Government joined Layton as a party defendant. The instant decision involves the determination of the ownership of the disputed portions of land to which both defendants claim title. In addition, the Court must resolve the question of the ownership of a certain area of land adjacent to, but outside of the land condemned in this proceeding. The Court's decision with respect to the title of land within the taking will determine to whom the monetary award is payable; however, any resolution of the ownership of land outside of the condemned parcel will be for the sole purpose of establishing just compensation for the land taken.[2]

Prior to the taking, in 1968, Layton and Island Farm were adjoining land owners separated in major part by the Deep Hole Creek.[3] Layton's property bordered on the Delaware Bay and consisted predominately of barrier beach land, sand and marsh. In the area pertinent to this dispute, Island Farm's acreage was primarily marsh and fast land.

The title dispute between Layton and Island Farm involves the land in the area of a small portion of the eastern boundary at the southeastern corner of

1. In an unreported memorandum opinion dated October 2, 1968, the Court denied the Government's request for a jury trial and granted Island Farm's motion requesting a commission pursuant to Rule 71A(h) Fed.Rules Civ.Procedure. Citing the peculiar nature of the land involved with varied uses and characteristics and the complex nature of setting just compensation in this situation, the Court found that the use of the commission procedure would be the appropriate mechanism to establish fair market value. (On the date of this decision, Layton had not been joined as a defendant).

2. In a letter opinion of September 15, 1970, the Court denied Layton's request to have the title dispute deferred until a state court proceeding to determine title could be prosecuted. The title of land within the condemnation area is to be determined by the Federal District Court, United States v. 3,276.21 Acres of Land, etc., 194 F.Supp. 297, 300 (S.D.Cal.1961).

In its letter opinion, the Court also stated that the ownership of the adjoining land was material to the issues of the market value of the land, particularly regarding severance damages. Concluding therefore, that it must resolve the title dispute regarding the adjacent lands, the Court held that any such resolution would have no legal consequences beyond the commission's determinations, and that its decision could not be pleaded as a defense of res judicata or collateral estoppel in any action brought in the State Courts to determine title.

3. Layton and Island Farm are abutting landowners further north in the area of Tract 79 Parcels A–C; however, this opinion will focus primarily upon their common border in Parcel D specifically the southern portion of the eastern boundary.

Parcel D (Tract 79c) of the condemned land. When defining the land to be taken, the Government utilized the Island Farm's deed description except for the area of land subject of this title dispute. Both of the boundaries immediately north and south of the disputed portion, Deep Hole Creek and Broadkill River respectively, coincide with the deed description of Island Farm's original title for all purposes pertinent to this opinion. However, for a distance of 37.4 chains (approximately 2,468 feet) running generally north-south, the Government arbitrarily established a straight line as the eastern boundary of that segment. The boundary was so delineated because in that area, the initial boundary as described in the Island Farm deed, was not readily ascertainable.[4] Subsequent to the Government's filing of the complaint herein the defendants raised their conflicting contentions with regard to title to the condemned lands and the appropriate allocation of the monetary award. The dispute evinced the importance of the delimitation of the exact location of the Island Farm-Layton boundary and its relationship to the Government's arbitrary designation and made necessary the delineation of the Island Farm and Layton interests in the property prior to condemnation.

## FACTUAL BACKGROUND

The land condemned by the Government is now part of the Prime Hook National Wildlife Refuge and lies immediately north of the Broadkill River in Broadkill Hundred, Sussex County, Delaware.

Prior to 1907, all of the property pertinent to the resolution of this title dispute was owned by George and Della Hall. It was comprised of two separate parcels:

1. A single piece of barrier beach land, starting below the southern terminus of Deep Hole Creek at its junction with the Broadkill River and extending to the then existing entrance of the Deep Hole Creek in the Delaware Bay approximately two miles to the north (what is presently primarily Layton's land), and

2. A parcel of marsh and fast land to the west of the barrier beach and separated from it along its entire length by the Deep Hole Creek (Island Farm's property). Running north from its confluence with the Broadkill River, Deep Hole Creek was then a navigable waterway and the sole means of access between the Broadkill River and the Delaware Bay.[5]

In 1907, the Government purchased 5.8 acres of barrier beach land from the Halls for purposes of constructing an inlet and jetty to stabilize the navigational channel between the Broadkill River and the Bay.[6] The 5.8 acres lay

4. The complaint and declaration of taking describe the pertinent portion of the parcel's boundary as follows:

". . . to Corner 8, the intersection of said right of way and the center-line of the channel of Deep Hole Creek; thence Southeasterly, along the center line meanders of the channel of said Creek, 112.0 chains, more or less, to Corner 9, the terminus of the channel of Deep Hole Creek; thence S. 27° 03' E., 37.4 chains, more or less, to Corner 10, the center line intersection of the channel remains of Deep Hole Creek and the northerly mean high tide line of the Broadkill River. . . ."

The Island Farm deed makes the center line of Deep Hole Creek the eastern

boundary until its juncture with the Broadkill River at the southeast corner of the property. The exact location of, and in fact, the possibility of locating this line is the central issue in this controversy.

5. For purposes of this opinion, the Court will discuss the area as though Deep Hole Creek ran north-south and the Delaware Bay was east of the barrier beach with all other directions adjusted accordingly. In fact, Deep Hole Creek runs north-west to south-east and the Bay lies north-east of the Layton and Island Farm land.

6. The junction of Deep Hole Creek and the Delaware Bay was an unimproved channel and subject to severe shoaling and

approximately one-quarter mile north of the Broadkill River—Deep Hole Creek juncture. On this acreage, the Government constructed a jetty which curved from north-east to south-west from approximately 250 feet into the Delaware Bay across the barrier beach and the Deep Hole Creek to the eastern edge of the marsh or fast land.[7] The Government, also, dredged a channel along the southern, concave edge of the jetty, thereby creating an inlet providing a navigable waterway for access to the Deep Hole Creek and the Broadkill River.[8]

In 1921, Della Hall sold the remaining barrier beach land to Layton. The conveyance consisted of two parcels, one immediately north of the Government's 5.8 acres and one immediately to the south. The deed purports to convey parcels bounded immediately on their northern or southern edge by the 5.8 acre parcel owned by the Government. However, at the time of the transfer some of the southern parcel had been eroded away by the Broadkill Inlet.[9]

In September, 1936, the marsh or fast land which was west of the Deep Hole Creek was deeded to H. Carlton Draper (Draper) who several months thereafter transferred title to Island Farm.[10] Although the deed described the entire eastern boundary as the channel of Deep Hole Creek, in the area south of the jetty a substantial portion of the Deep Hole Creek had been obliterated by the inlet and accompanying channel to Broadkill River.[11] A portion of Island Farm's land bordered on the Broadkill Inlet and was not separated from the Delaware Bay by any barrier beach land.[12]

Shortly after Draper had purchased his property, the Government constructed a second inlet, Roosevelt Inlet, to provide a navigable channel to the Broadkill River. Built in 1938, Roosevelt Inlet lay several miles south of Lewes Inlet and its confluence with the Broadkill River and became the principal channel between the Delaware Bay and the Broadkill River. Broadkill Inlet rapidly assumed a subordinate role as a navigational waterway and eventually began to shoal up. In 1953, the Government authorized the abandonment of the Broadkill Inlet for navigational purposes. While the precise date of its closure is not ascertainable from the record, apparently, by 1954, the inlet had completely filled in to reform an unbroken barrier beach.[13] This alluvium extended from the Bay to the edge of Island Farm's property, thereby completely blocking the flow of water from the terminus of Deep Hole Creek just north of the jetty to the Broadkill River ap-

littoral drift. The inlet moved in a generally northerly direction from year to year, and was unacceptable as a permanent channel for navigation.

7. See FX–9 U. S. Corps of Army Engineers 1911 plans for reinforcement of the jetty. See also FX–8(a).

8. The inlet and the creek into which it was dredged have been known by numerous names throughout its history including Lewes Sound, Broadkill Sound, Deep Hole Creek, and Broadkill Inlet. While these names are often used interchangeably especially on older documents, throughout this opinion they will be designated as follows: The creek—Deep Hole Creek; and the inlet—Broadkill Inlet.

9. The extent of such erosion will be discussed in a subsequent · portion of the opinion. Both defendants acknowledge that at least portions of the southern Layton tract had been eroded away and were covered by the waters of Broadkill Inlet. However, regardless of the extent of this erosion, Della Hall conveyed whatever barrier beach land still existed to Layton.

10. Island Farm was incorporated by Draper, and he and his two daughters are sole shareholders. The transfer to Island Farm took place in January, 1937.

11. See and compare FX–19(b), FX–23 and FX–7. The nature of Island Farm's riparian boundary and the extent of its border on the Broadkill Inlet is crucial to the resolution of this title dispute and will be discussed in detail subsequently.

12. See footnote 11. Appendix I portrays a rough approximation of the area in the 1932–1943 period.

13. See FX–19(c) and LX–9.

proximately one-half mile to the south.[14] The old channel of Deep Hole Creek was not ascertainable as a waterway from several hundred feet north of the jetty, Point 9 on the Government's Description of Taking, to the Broadkill River, Point 10. As has been indicated, the Government arbitrarily established a straight line between these two points as the boundary of the land subject to this condemnation proceeding.

Between its construction in 1907 and its closure approximately 47 years later, Broadkill Inlet was subject to sizeable fluctuations in size and depth. Substantial portions of Island Farm's land fronting on the inlet and Draper's southern parcel of barrier beach land were eroded away and covered by water. In addition, immediately north of the jetty, the Deep Hole Creek move westward and opened a channel around the southwest tip of the jetty. The precise location at which the inlet initially closed is disputed by the parties; however, the evidence clearly indicates that manner of the closing was predominately the slow and gradual process of accretion.[15]

In 1957, Layton purchased from the Government whatever lands it then owned in the area of the jetty.

In 1968, with the consent of Island Farm, Layton dredged a ditch between Points 9 and 10 connecting the Deep Hole Creek with the Broadkill River. Known as the "Thompson Ditch", it runs in a roughly straight line, except for a portion of approximately 350 feet imme-

diately north of Point 10, and is slightly east of the Government's arbitrary line.

After the present title dispute arose, the Government conducted a field survey to delineate the channel of the defunct Deep Hole Creek between Points 9 and 10. Conducted by Mr. Roger Tornstrom (Tornstrom) and assistants, the survey resulted in the demarcation of a line purporting to represent the channel of Deep Hole Creek as of the date of the study, May 1969. The line had numerous bends and intersected the Government's arbitrary line on five occasions excluding the two terminal points. Although some portions of the Tornstrom line are actually under water, most of it is delineated on solid land. Approximately 3.7 acres of land in these parcels lies to the east of the purported channel of Deep Hole Creek but is contained within the land condemned by the Government.[16]

## THE TITLE DISPUTE

■ Both of the defendants argue that the straight line between Points 9 and 10 is not an accurate demarcation of their boundary. The Government has not attempted to demonstrate that its arbitrary line accurately reflects the Island Farm-Layton boundary.[17] Since the resolution of any title dispute in a condemnation proceeding is the responsibility of the courts, mere designation by the Government of the boundary of the condemnation parcel does not con-

14. This area included several pond like depressions which were connected by a stream-like channel. However, subsequent to 1954, with the exception of periods when this entire area was under water, no natural waterway linked these two points. FX–19(c) and LX–9, FX–19(d), FX–22.

15. Although agreeing generally with the accretion theory, Layton's expert, Vohnnie L. Pearson, Jr., (Pearson), testified that the final closure of the Deep Hole Creek was probably by the process of

avulsion, a sudden movement of land, most likely during a storm. The defendants conflicting theories regarding the closure are central to the resolution herein, and will be examined subsequently.

16. This acreage is claimed by Layton who seeks the monetary award for it. The basis of this claim will be discussed in a later section of the opinion.

17. Evidently, from Tornstrom's efforts, the Government has acknowledged the existence of some discrepancies between their taking and the actual border line.

stitute an effective arbitration of conflicting claimants' interests in land.[18]

At least as late as 1943, and prior to the closing of the Broadkill Inlet, the lands owned by Layton and Island Farm were at all pertinent times separated by water.[19] The boundaries of both landowners were watercourses, and as such made both properties riparian to the waterway to which said land was contiguous.[20] Such boundaries are subject to alteration with the gradual fluctuations of the shores and channels of the adjacent waterways.[21] It is readily apparent from the oral and pictorial testimony that the several waterways involved herein, the Deep Hole Creek, the Broadkill Inlet, the Broadkill River, and the Delaware Bay, underwent substantial changes subsequent to the construction of the jetty which resulted ultimately in the closure of the Broadkill Inlet and Deep Hole Creek between Points 9 and 10. Since such changes dictate the location of both defendants' boundaries, the fluctuations must be reconstructed as accurately as possible on the basis of the evidence elicited at trial.

The nature of the waterways separating the two defendants' properties between Points 9 and 10 varies considerably, as do the factual issues and legal doctrines pertinent to demarcation of the Island Farm-Layton boundary. The area can be divided into three separate segments. The first segment is the area north of the jetty, where Deep Hole Creek continued to exist after moving westward to permit passage around the southern terminus of the jetty.[22] The second segment is the area immediately *south of the jetty in which* Deep Hole Creek had been obliterated by the waters of the Broadkill Inlet and had ceased to be a cognizable waterway.[23] In this second segment, for a distance of several hundred feet, there was no barrier beach land separating Island Farm from the Delaware Bay.[24] The third segment is the area immediately north of Point 10, near the confluence of the Broadkill River and the Broadkill Inlet, where Layton's land lay between Island Farm and the Delaware Bay. In this area, the defendants' properties were separated by the channel joining the river and the inlet, a channel which prior to the construction of the inlet was Deep Hole Creek.

The fact that both defendants' deeds cite the channel of Deep Hole Creek as the boundaries of their respective properties between Points 9 and 10 is not decisive, since the grantor, Mrs. Hall, could only transfer title to whatever land she then owned,[25] and much of Deep Hole Creek and the lands bordering thereon had been obliterated by the Broadkill Inlet. In Delaware, the riparian land owner has title to the mean low-water mark and the State owns the bed of navigable waters beyond that point.[26] Therefore, since the inlet and river were navigable, Mrs. Hall's title to

18. U. S. v. 3,276.21 Acres of Land, supra, 194 F.Supp. at 300 (S.D.Cal.1961), and Mollohan v. Gray, 413 F.2d 349, 352–353 (9th Cir. 1969).

19. FX–19(b); see also FX–12(a)–12(p) and FX–23.

20. State ex rel. Buckson v. Pennsylvania Railroad Co., 228 A.2d 587 (Del.Super. Ct.1967).

21. 56 Am.Jur., "Waters", § 477; Oklahoma v. Texas, 268 U.S. 252, 256, 45 S.Ct. 497, 69 L.Ed. 937 (1925); Arkansas v. Tennessee, 246 U.S. 158, 173, 38 S.Ct. 301, 62 L.Ed. 638 (1918); see also State ex rel. Buckson v. Pennsylvania Railroad Co., 267 A.2d 455, 459 (Del.

Sup.Ct.1969) aff'g 244 A.2d 80, 81 (Del. Super.Ct.1968).

22. FX–19(b), FX–11, FX–15, FX–16(1), FX–21, FX–8A, FX–9; see Appendix I.

23. FX–19(b), FX–23, FX–15, FX–12(a)– (p), FX–21, FX–16(1).

24. See footnote #22; and Draper testimony, Tr. 23–31, 39.

25. 23 Am.Jur.2d, "Deeds" § 289 (1965), citing Hunt v. Blackburn, 128 U.S. 464, 9 S.Ct. 125, 32 L.Ed. 488 (1888) and Batchelor v. Brereton, 112 U.S. 396, 5 S.Ct. 180, 28 L.Ed. 748 (1884).

26. State ex rel. Buckson v. Pennsylvania Railroad Co., 267 A.2d 455 (Del.Sup.Ct. 1969).

the barrier beach land south of the inlet and fast land to the west thereof had been lost to the extent that the waters of the inlet had eroded said lands.[27] The fact that the deeds recite that the common boundary between both defendants' properties was Deep Hole Creek is irrelevant when the creek could no longer be discerned.

When a property is bounded by a creek or stream, the boundary will fluctuate with the changes in the course of the waterway.[28] Since the barrier beach land and the mainland were initially bounded by Deep Hole Creek along their entire borders, wherever Deep Hole Creek continued to flow, it remained the common boundary.[29] However, where Deep Hole Creek ceased to exist and became obliterated by the waters of the Broadkill Inlet, it no longer remained the common boundary. In these areas, the two defendants' land is bounded by the waters of the inlet and its accompanying channel to the Broadkill River.

In the area north of the jetty, Deep Hole Creek remained the boundary line separating the two defendants after the Government completed construction of the jetty.[30] FX–22 shows

that prior to the construction of the Thompson Ditch, Deep Hole Creek continued to flow in a narrow channel throughout this area.[31] Draper's testimony and the several aerial photographs taken between 1938 and 1968 demonstrate that the creek became narrower by the gradual and imperceptible buildup of sand and other sediment.[32] Since the northern inlet linking Deep Hole Creek to the Delaware Bay had closed considerably before 1954, the Deep Hole Creek had no outlet to the bay and was not subject to tidal flow except during storms or extreme high tides when the entire area was covered by water.[33] As a result of the closing of both inlets and the gradual buildup of sand, at some point Deep Hole Creek became non-navigable. When that occurred, Layton and Island Farm became the owners of the bed of the stream to the center line of the channel or run on their respective sides.[34]

The construction of the Thompson ditch obliterated and replaced the remaining channel of Deep Hole Creek.[35] Since a natural boundary cannot be altered by the unilateral act of one

27. A riparian landowner has title to the extent of the law of the situs of the land. Jefferis v. East Omaha Land Co., 134 U.S. 178, 10 S.Ct. 518, 33 L.Ed. 872 (1890) ; 1 Farnham, Water & Water Rights, §§ 62, 63 (1904).

28. Jefferis v. East Omaha Land Co., supra; Mayor, Aldermen and Inhabitants of City of New Orleans v. United States, 10 Pet. 662, 35 U.S. 662, 9 L.Ed. 573 (1836) ; Lower Township v. City of Wildwood, 130 N.J.L. 186, 31 A.2d 807 (Ct. of Err. and App.N.J.1943) ; 5A Thompson on Real Property, § 2560 (1957).

29. See State ex rel. Buckson v. Pennsylvania Railroad Co., 228 A.2d 587 (Del. Super.Ct.1967).

30. See footnotes 20 and 21 and accompanying text. See also FX–15, FX–19(b), FX–23, FX–19(c), FX–19(d), FX–22.

31. FX throughout this opinion refers to Island Farm exhibits and LX refers to Layton exhibits.

32. Draper testimony, Tr. 32–33, 87–89, 91, 95, 102; FX–23, FX–19(b), FX–19(c), FX–19(d), FX–22. Pearson testified that in his expert opinion Deep Hole Creek probably closed finally through process of avulsion. This testimony refers to the area south of the jetty and does not preclude the gradual filling in north of the jetty by process of accretion.

33. The northern inlet closed between 1932 and 1937, see FX–12(j) and FX–12(k). The testimony of Draper indicates that Deep Hole Creek was connected to the Broadkill River by a drainage ditch intersecting the creek north of Point 9, but that this ditch was used solely to supply water to a pond which Draper had constructed for duck hunting. (Tr. 99–101).

34. Delaney v. Boston, 2 Del. 489 (1839) ; see generally, 56 Am.Jur., "Waters", § 455 (1947) and cases cited therein.

35. Compare FX–22 and LX–4A.

adjacent landowner,[36] the Island Farm-Layton boundary necessarily became fixed and coincided with the creek's channel immediately prior to the construction of the Thompson ditch. FX–22 is the last available photograph indicating the channel of Deep Hole Creek. Therefore, the Court concludes, that the centerline of the Deep Hole Creek as it existed on May 19, 1968, represents the closest approximation of the final channel of the creek which can be ascertained from the present record, and for purposes of this litigation, this centerline is the boundary line separating Island Farm and Layton between Point 9 and the southern terminus of the jetty.

The Court cannot accept the Tornstrom line in its entirety as the boundary in this area north of the jetty. In addition to the questionable efficacy of the method utilized to establish the line,[37] the Government employees responsible for the survey testified that the presence of the newly constructed Thompson ditch precluded an accurate demarcation of the line north of the jetty.[38] It should be noted, however, that the differences between the Tornstrom line and the 1968 channel are not substantial, and acceptance of the former would not significantly alter the boundary line.[39]

This segment of the Layton-Island Farm boundary intersects the Government's arbitrary line at three spots.[40] Two small portions of land are created, one on each side of the arbitrary line. The first segment immediately below Point 9 is approximately one acre [41] and belongs to Layton because it is east of the pertinent boundary. Since it is within the parcel taken, Layton is entitled to receive the appropriate compensation for this parcel. The second parcel, of about three-tenths of an acre, lies to the east of the arbitrary line but west of the actual boundary and is the property of Island Farm.[42]

The most important segment of the three enumerated above is in the area commencing at the southern terminus of the jetty running south to the point in the Broadkill Inlet where the southern parcel of Layton's land began. As stated previously, in this section, the Court must establish not only the owner of the land condemned by the Government, but also whether Island Farm owns any land outside the condemned parcel which might necessitate the payment of severance damages.

36. See Am.Jur., "Waters", § 486 and cases cited therein.

37. Mr. Tornstrom and his colleagues moved from Point 9 to Point 10 attempting to discern the line marking the low spot in the marsh which was supposed to represent the 1969 channel of Deep Hole Creek. In some areas, the line signifies a "definite depression [in the] marsh, . . . soft and salty, and . . . a distinct change in vegetation" (Tr. 383), and in others which were under water, the line depicts what Mr. Tornstrom could discern as the lowest point in ponds and potholes after making numerous "trips back and forth across [the] pond, falling into [the] muddy mire area until I found what I considered the deepest point." (Tr. 443).
Since there was no Deep Hole Creek with water in it between Points 9 and 10, Tornstrom was often necessarily attempting demarcating the last portion of the creek to fill in. The area involved has been subject to frequent flooding in

storms, etc., and just one year prior to the Tornstrom expedition, Layton had constructed a channel between Points 9 and 10. These occurrences undoubtedly affected the area's topography. (By Tornstrom's own admission the accuracy of approximately one-third of the entire line was doubtful because of the presence of Thompson's ditch).

38. See Tornstrom's testimony, Tr. 391–392, 451–455, 463.

39. Compare FX–22 and LX–4C.

40. Id.

41. This and the subsequent acreage figure are derived from the Tornstrom calculation since the two parcels involved are respectively roughly equivalent under the 1968 creek channel theory or Tornstrom's line. See Tr. 412–420; LX–6, LX–7.

42. These parcels are clearly shown in LX–4C. This boundary is depicted in Appendix II.

Layton argues that the Broadkill Inlet closed by the process of accretions to the barrier beach land north and south of the inlet. These accretions allegedly joined to form a solid barrier beach parcel. Subsequent to this formation, Deep Hole Creek is said to have begun to fill in by accretion from the barrier beach land to the back or fast land, east to west, until it finally closed by avulsion at the point marked by the Tornstrom line. Under the law governing title to accretions, Layton claims title to all of the barrier beach land to the east of the Tornstrom line, the alleged final center-line of Deep Hole Creek. Approximately 2.7 acres of land in two parcels (2.4 and 0.3 acres) within the condemnation acreage are claimed by Layton since the parcels are east of the Tornstrom line.

Island Farm argues that it has title to the land in question since the accretions formed on its eastern bank and extended eastward until the inlet closed. In the alternative, Island Farm maintains that regardless of the manner by which the accretions formed, it was riparian to the Delaware Bay and under the law of accretion, it would be entitled to this accretion because a landowner cannot gain title to lateral accretions and thereby eliminate an adjoining riparian owner's access to the water.

The Court cannot accept either defendants' factual hypotheses regarding the closure of the Broadkill Inlet. Layton bases her position on the testimony of Vohnnie L. Pearson, Jr., (Pearson), who is quite experienced in matters of erosion, accretion and beach control in Delaware.[43] Relying primarily upon aerial photographs and secondarily coastal surveys without any first hand observation or examination, Pearson testified that, in his opinion, the inlet had closed solid from north to south by accretions then westward through the same process until an avulsion finally closed what remained of the creek.[44] Mr. Pearson presented a chart representing the fashion in which an inlet similar to the Broadkill Inlet would close.[45] However, Mr. Pearson's hypothetical inlet varies in several significant aspects from the Broadkill Inlet situation. It includes neither a creek in the area of the northern remnant of Deep Hole Creek, nor an alternative access to the bay such as Roosevelt Inlet; and it does not have an outside beach line which has eroded substantially westward similar to the Layton southern parcel.[46] The presence of the creek emptying into the inlet makes Mr. Pearson's testimony that the Broadkill Inlet closed completely from north to south untenable. Such a closing would have restored the channel of Deep Hole Creek between Points 9 and 10. The 1954 photograph [47] shows that there was no such channel, and Pearson explains this by asserting that after the inlet had been sealed north to south, it began to accrete in a westerly direction and closed ultimately by avulsion.[48] There is no evidence to support this theory, and it does not conform to the factual evidence available or common sense.[49] While the waters of the Broadkill Inlet gained access to the

---

43. Although no attempt was made to have Pearson declared an expert witness by the Court, it is evident from his academic and professional record that he is most knowledgeable in the area of physical oceanography, and the Court will treat his testimony as that of an expert. See Tr. 465–474 for a discussion of Pearson's qualifications.

44. Pearson testimony, Tr. 488–506, 541–546.

45. LX–11.

46. Pearson acknowledged the existence of these additional factors, but concluded, nonetheless, that they would not have affected his basic theory.

47. See also Draper's testimony, Tr. 95.

48. Pearson testified that waves washing over the newly formed barrier beach would deposit sand in the creek channel, and wind blown particles would settle there also. Tr. 498.

49. Draper acknowledged that he could not be certain that Deep Hole Creek did not reappear (Tr. 89) ; however, he, also, stated that there was little if any difference between when the inlet closed where it joined the Broadkill River or the Deep Hole Creek. (Tr. 88–89.)

Delaware Bay via the Roosevelt Inlet, Deep Hole Creek north of the jetty had no alternative inlet in 1954. If the inlet had closed as Pearson suggests and Deep Hole Creek had reappeared, it is inconceivable that the creek would have closed as Pearson describes because it would have been a tidal channel linking the Delaware Bay-Roosevelt Inlet with the northern segment of Deep Hole Creek. The creek would not be subject to the process of littoral drift which Pearson cited as the reason for shoaling and eventual closure. It would be no more likely than any creek, including the Thompson ditch, to close by accretion and avulsion. An examination of Thompson ditch demonstrates the abundant flow of water to and from the northern segment of Deep Hole Creek and makes doubtful Pearson's contention that westward accretions closed the creek. Pearson's theory may be valid when limited to his hypothetical example; however, it is not persuasive when the presence of the northern portion of Deep Hole Creek and the Roosevelt Inlet are realized.

On the basis of the present record, the Court finds that the inlet initially closed by the process of accretion between the southern portion of Layton's land and the eastern boundary of Island Farm's land. All of the factual evidence, pictorial and oral, as well as most of Pearson's testimony supports this conclusion.[50] A comparison of the 1938 and 1943 photographs reveals an appendage of land building from the north-west edge of the Layton southern parcel in the direction of the Island Farm land.[51] The photographs, a Corps of Engineer's

Hydrographic (FX–21), and a Coast and Geodetic chart (FX–15) demonstrate further that the southern parcel of barrier beach land lay considerably farther west than its northern counterpart. Accretions from the southern parcel in the northerly direction posited by Pearson would reach no farther east than the southern terminus of the jetty in the area of Deep Hole Creek.

The United States Coast and Geodetic navigational chart for 1954 indicates that the inlet had closed between Island Farm and Layton's southern parcel although it remained open for access to the northern portion of Deep Hole Creek.[52] Layton has challenged the accuracy of the Geodetic Charts. The Court acknowledges certain discrepancies, but concludes, nonetheless, that in this circumstance any evidence serving to elucidate the process by which the Broadkill Inlet closed must be ascribed some probative weight. Exhibit FX–12(s) embodies the first and only available evidence of the initial closure of the Broadkill Inlet. The Court does not rely solely upon this exhibit; however, in a situation such as this where the evidence is so sparse, FX–12(s) affords confirmation of the culmination of the gradual closure indicated in the 1938 and 1943 photographs.[53]

James F. Richardson, of the National Ocean Survey, Coast and Geodetic Survey testified regarding the procedure through which the navigational charts are compiled. He claimed that the charts were supposed to be accurate concerning topography of land adjacent to waterways and that the charts are up-

---

50. Draper testimony, Tr. 32–33, 87–89, 91, 95, 102; FX–23, FX–19(b), FX–19(c), FX–19(d), FX–22; Pearson testimony, Tr. 501–505, 541–542, 546; LX–10.

51. This movement is also shown by FX–12(h)–(r).

52. FX–12(s).

53. The Geodetic Charts FX–12(t)–(cc), 1954–1962 indicate that the Broadkill Inlet continued to link Deep Hole Creek to the Bay. The 1954 and 1960 photographs refute this; however, the fact that the

charts do not immediately reflect the subsequent closure of the Deep Hole Creek does not render these exhibits of no evidentiary value. In fact, since Deep Hole Creek had no access to the bay, it is not unlikely that in wet periods or periods of high tides, the inlet reopened to provide egress and ingress to the creek. The fact that the agency does not receive every piece of information does not obviate the fact that this particular pertinent occurrence was obtained and considered sufficiently accurate to merit inclusion in the 1954 chart.

dated on the basis of information received regarding changes in coastline or water depths. (Tr. 629–632.) Further, Richardson asserted that information is evaluated for accuracy and where necessary field investigation is undertaken for verificational purposes.

It is probable that the entire area around the southern portion of the jetty had closed up shortly after or in conjunction with the junction of the Layton southern parcel and the Island Farm land.[54] The 1954, 1960, and 1968 photographs indicate that the alluvion which formed in the inlet initially bordered on the Delaware Bay considerably to the west of the northern Layton parcel, and that several years elapsed before the beach had realigned.[55]

In Pearson's hypothetical model, the barrier beach would realign before the remaining creek would begin to fill in. The 1954, 1960, and 1968 photographs indicate that the flow of water had ceased between the northern remnant of Deep Hole Creek and the Broadkill River while the beach was still undergoing the realignment process. This inconsistency between Pearson's testimony and the fact situation herein further supports the conclusion that the inlet closed initially between Layton's southern parcel and Island Farm's land.

Island Farm's contention that the accretions formed exclusively against its land is unsupported. It is apparent that much of the accretion formed against Layton's southern parcel. The 1943 photograph (FX–19(b)) indicates substantial shoaling just north and west of this parcel. This photograph shows some sand deposits on the Island Farm boundary; however, it is insufficient to substantiate Island Farm's claim.

In 1936, when Draper purchased the Island Farm land, it was riparian to the Broadkill Inlet with access to the Delaware Bay unimpeded by any land formation through an area of several hundred feet.[56] Whether the area was once part of the Government's 5.8 acres or a portion of land immediately south thereof owned by Layton or Mrs. Hall, the Broadkill Inlet had eroded away a sizeable area of what was once barrier beach land.[57]

 There are two general theories governing who obtains title to accretions attaching to or forming in front of a riparian landowner. The first, and perhaps most frequently cited theory is that the landowner to whom the accretion first attaches, or against whose land the accretion first forms gains title to the resulting alluvion.[58] This theory is often explained by the concept, to him who sustains the burden of loss goes the benefit of gain. The second rule is that a riparian landowner cannot be made non-riparian by accretion and therefore, regardless of the manner in which an alluvion accretes or to whom it initially attaches, the riparian owner in front of whose land it forms gets title to it.[59] In most situations, the results

54. See Draper testimony, Tr. 88–89.

55. FX–19(c), FX–19(d), FX–22; LX–4A.

56. See FX–15, FX–21, FX–19(b), FX–23, FX–16(1). The extent of this riparian boundary will be discussed subsequently.

57. While the initial channel of the inlet was 250 feet, the various exhibits, FX–19(b), FX–15, FX–23, and FX–21, indicate that the inlet had become substantially wider than that.

58. Nebraska v. Iowa, 143 U.S. 359, 12 S. Ct. 396, 36 L.Ed. 186 (1892); County of St. Clair v. Lovingston, 23 Wall. 46, 90 U.S. 46, 23 L.Ed. 59 (1874); see generally, 56 Am.Jur., "Waters", §§ 476–479 and cases cited therein; 5A Thompson on Real Property, § 2560 (1957) and cases cited therein.

59. St. Louis v. Rutz, 138 U.S. 226, 11 S. Ct. 337, 34 L.Ed. 941 (1891); Steinem v. Romney, 233 Md. 16, 194 A.2d 774 (1963); Waring v. Stinchcomb, 141 Md. 569, 119 A. 336 (1922); Payne v. Hall, 192 Iowa 780, 185 N.W. 912 (1921); Yearsley v. Gipple, 104 Neb. 88, 175 N. W. 641 (1919); Lamprey v. Metcalf, 52 Minn. 181, 53 N.W. 1139 (1893); Crandall v. Allen, 118 Mo. 403, 24 S.W. 172 (1893). See generally, 56 Am.Jur., "Waters", §§ 478, 480, 494; Farnham, supra, § 69; Thompson, supra, § 2560.

obtained by employing each theory coincide; however, when a conflict arises, it is the second rule which predominates.[60] Recognizing the importance of riparian access to the value of property, courts have been most reluctant to permit an individual to gain title to an accretion when by doing so it would eliminate another riparian owner's access to the water.

In Hughes v. Washington, 389 U.S. 290, 88 S.Ct. 438, 19 L.Ed.2d 530 (1967), the Court enunciated the motivating factor underlying the allocation of title to accretions:

> A long and unbroken line of decisions of this Court establishes that the grantee of land bounded by a body of navigable water acquires a right to any natural and gradual accretion formed along the shore. . . . [T]he soundness of the principle is scarcely open to question. Any other rule would leave riparian owners continually in danger of losing the access to water which is often the most valuable feature of their property . . .[61]

Section 2560 of Farnham, supra, reiterates this concept. "One of the most valuable of the rights of the riparian owner is the right to preserve his contact with the water by appropriating the accretions which form along his shore."

The case of Lamprey v. Metcalf [62] provides the most widely cited example of a court's recognition of the importance of riparian rights and its reluctance to allow an adverse claimant to eliminate said rights. In *Lamprey*, the court discussed the proper rationale governing the allocation of title to accretions in the following fashion:

> The reasons usually given for the rule [governing allocation of title to accretions] are either that it falls within the maxim, *de minimis lex non curat*, or that, because the riparian owner is liable to lose soil by the action or encroachment of the water, he should also have the benefit of any land gained by the same action. But it seems to us that the rule rests upon a much broader principle and has a much more important purpose in view, viz. to preserve the fundamental riparian right—on which all others depend, and which often constitutes the principal value of the land—of access to the water. The incalculable mischiefs that would follow if a riparian owner is liable to be cut off from access to the water, and another owner sandwiched in between him and it, whenever the water line had been changed by accretions or relictions, are self-evident, and have been frequently animadverted on by the courts.[63]

In most instances, the land to which an accretion initially attaches is also the land which would lose riparian access if title to the accretion was vested in another landowner. In such circumstances, the courts are not compelled to distinguish between the two theories, since under either theory the result would be the same. However, when a riparian landowner faces the loss of his access to water through a neighbor's claim to lateral accretion in front of the riparian owner's land, the *Hughes* rationale would dictate an allocation which preserves each owner's riparian rights. The authorities and cases support this result.[64]

---

60. See cases and authorities cited in footnote 59. See also Wemmer v. Young, 167 Neb. 495, 93 N.W.2d 837 (1958); Widdecombe v. Chiles, 173 Mo. 195, 73 S.W. 444 (1903); Welles v. Bailey, 55 Conn. 292, 10 A. 565 (1887).

61. 389 U.S. at 293, 88 S.Ct. at 440; in accord, Burns v. Forbes, 412 F.2d 995 (3d Cir. 1969); U. S. v. 222.0 Acres, etc., 306 F.Supp. 138 (D.Md.1969). In *Forbes*, the Court said: "[t]he right of access to the water in front of his land is the fundamental riparian right which the owner of littoral land enjoys." At 412 F.2d 998.

62. 52 Minn. 181, 53 N.W. 1139 (1893).

63. 53 N.W. at 1142.

64. See footnote 59 and cases cited therein.

In Waring v. Stinchcomb,[65] the Maryland Court followed the *Lamprey* rationale to preserve a riparian owner's access to water. The case involved two adjoining landowners on the Chesapeake Bay who were separated by the Magothy River. An alluvion contiguous to the defendant's land formed across the mouth of the river and a sand bar built up in front of the plaintiff's land separating it from the bay. The process resulted in a substantial formation of land in front of but not contiguous to the plaintiff's land. The Court held that the plaintiff had title to the alluvion so as to preserve his riparian border on the Chesapeake. Reiterating the above quoted statement from the *Lamprey* opinion, the Court found for the plaintiff in spite of the fact that his land had three-quarters of a mile frontage remaining on the Chesapeake and the land to which he obtained title was not contiguous to his land.

In the case of Crandall v. Allen,[66] the Missouri Supreme Court specifically rejected the efforts of one riparian landowner to claim title to an accretion in front of an adjoining riparian owner. The unsuccessful owner had alleged that the alluvion first attached to his land and then accreted across in front of his neighbor's property. The Court held that each riparian land owner would be apportioned a share of the alluvion on the basis of the extent to which each man's original riparian boundary was covered by the accretions. Rejecting one landowner's effort to confiscate another's riparian border, the Court said:

[T]he contention is simply this: that if, in the forming of accretions along a river front, it can be shown that the point of contact was first made to the lands of one of the riparian owners, he is entitled thereby to the whole accretion subsequently made to the lands of other riparian owners on either side of him, and although this would cut off their water boundaries and privileges. * * * On the contrary, the authorities are numerous and well considered which scrupulously preserve to each adjoining riparian owner his water boundaries and privileges.[67]

The case of Rondesvedt v. Running [68] involved a fact situation similar to that in *Crandall*. Accretions to plaintiff's property had moved laterally into the lake on which both landowners bordered, to form a peninsula extending in front of but approximately forty yards away from the defendant's land. Acknowledging that the defendant would remain riparian to the lagoon under the normal rule that an accretion belongs to the owner of the land to which it attaches, the Court nonetheless concluded, "that accretion extending laterally is not to increase the amount of access of one owner to navigable water at the expense of other owners." [69] Since access solely to the lagoon would make access to the lake more difficult and time-consuming, the defendant was given title to the portion of the alluvion which was within her boundary lines as extended into the lake.

■ A large number of cases have held that when the land of a riparian owner is completely lost by erosion and a non-riparian owner made riparian that subsequent accretions belong to the new

---

65. 141 Md. 569, 119 A. 336 (1922). In accord, Steinem v. Romney, supra. In *Steinem*, two landowners on opposite sides of a river claimed title to a sand bar which had formed by accretion. The bar had attached to one side and then formed across the channel and down the other side in front of but not contiguous to the other side's property. The Court refused to give title to the entire alluvion to the owner of the land where the bar attached since the bar lay directly in front of the second party and to do so would eliminate that party's access to the water.

66. 118 Mo. 403, 24 S.W. 172 (1893).

67. 24 S.W. at 174. In accord Pearson v. Heumann, 294 Mo. 526, 242 S.W. 946 (1922).

68. 19 Wis.2d 614, 121 N.W.2d 1 (1963).

69. 121 N.W.2d at 5; see also St. Louis v. Rutz, supra, 138 U.S. at 250, 11 S.Ct. 337 (dicta); Farnham, §§ 62, 65 and cases cited therein.

riparian owner even if they cross what had been the original boundary.[70] Obviously, in these cases, the importance of maintaining an individual's riparian boundary and his accompanying rights prevails over the concept of balancing the loss of erosion against the gain of accretion. The courts reason that once the individual's boundary becomes riparian, he is entitled to all riparian rights and cannot be deprived of them by a landowner interposed by the waterway's fickle meanderings.

■ The ordinary method for allocating an alluvion accreted across adjacent landowners is to apportion to each landowner a share of the water line proportionate to his share of the original line covered by the accretion.[71] Title to the entire alluvion does not vest in the individual to whom the accretion first attached since that would eliminate the other's riparian access.[72]

■■ The above cited cases and authorities clearly elucidate the importance of riparian rights and the necessity for allocating title to alluvions to preserve each man's riparian boundary. Where an accretion initially attached, whether it was contiguous to the claimant, and whether the claimant had other riparian access have been held irrelevant when, as here, a riparian owner is threatened with the loss of his essential riparian boundary. Therefore, the Court need not ascertain to whom any portion of the accretion attached, and the alluvion in the Broadkill Inlet must be allocated to preserve each landowner's riparian rights.

Layton has attempted to distinguish all of the above cases and dismiss the second theory governing the allocation of accretions on the ground that in those cases the adjoining landowners all fronted on the same bank whereas in this case Layton and Island Farm were never so situated. This distinction is without merit. Island Farm's riparian access to the Delaware Bay was a valuable attribute of its property and should be entitled to the same protection from lateral encroachments that was afforded landowners in the above cited cases.

Layton has raised several additional arguments to contest Island Farm's claim to the Broadkill alluvion. Before determining the appropriate allocation of the alluvion, these arguments must be answered.

■■ Layton's initial contention is that Broadkill Inlet was an artificial waterway, and therefore, the erosion and accretions do not affect title to the inlet and adjacent areas. In general, riparian rights attach to land adjacent to natural watercourses, but do not attach to land adjoining an artificial channel.[73] Thus, ordinarily, the processes of accretion and erosion will not affect title. Riparian rights can, however, be obtained on artificial waterways by prescription.[74] The Broadkill Inlet had been open since 1907, well beyond the twenty year period

---

70. Yearsley v. Gipple, supra; Widdecombe v. Chiles, supra; Doebbeling v. Hall, 310 Mo. 204, 274 S.W. 1049 (1925); Dewey Land Co. v. Stevens, 83 N.J.Eq. 314, 90 A. 1040 (1914); see 8 A.L.R. 640, Right to Follow Accretions Across Division Line Previously Submerged by Action of Water; 41 A.L.R. 395 (supplemental annotation) and cases cited therein. Exceptions to this rule generally involve situations where title to the submerged land remains in the original owner, or the boundary line was not the waterway and is easily relocated, circumstances not present in this case. Allard v. Curran, 41 S.D. 73, 168 N.W. 761 (1918); Stockley v. Cissna, 119 F. 812 (6th Cir. 1902);

Ocean City Assoc. v. Shriver, 64 N.J.L. 550, 46 A. 690 (1900).

71. 56 Am.Jur. "Waters", §§ 494 et seq. and cases cited therein.

72. Crandall v. Allen, supra; Peoria v. Central Nat. Bank, 224 Ill. 43, 79 N.E. 296 (1906); Doebbeling v. Hall, supra. See Gould on Waters, § 162 (3rd Edition).

73. Compare 1 Kinney on Irrigation & Water Rights, § 468 with 56 Am.Jur. "Waters", § 155; 93 C.J.S., "Waters", § 129; Farnham, supra, § 463.

74. Delaney v. Boston, supra, 2 Del. at 491; 56 Am.Jur. "Waters", § 155; Farnham, supra, § 820.

requisite to obtain prescriptive rights in Delaware.[75]

■ In addition, artificial waterways may have the "characteristics and incidents of a natural watercourse."[76] The criteria relevant to a determination of whether an artificial waterway is to be treated as a natural one are: 1. was it temporary or permanent; 2. what were the circumstances by which it was created; and 3, what was the manner in which it was enjoyed.[77]

"Where the way is of a permanent character, and is created under circumstances indicating an intention that it shall become permanent, and it has been used consistently with such intention for a considerable period, it is generally regarded as stamped with the character of a natural watercourse, and treated, so far as the rules of law and the rights of the public or of individuals are concerned, as if it were of natural origin."[78]

■■ Further, if an artificial channel is substituted for a natural one it maintains the characteristics of the natural channel.[79] Broadkill Inlet was an alternative channel for access to the Delaware Bay, and was maintained for public use as a navigational channel. It was open from 1907 until sometime prior to 1954 after the Government abandoned it. Unlike the canals, reservoirs, ponds and other artificial bodies of water cited in the cases relied on by Layton, the Broadkill Inlet was not easily discernable from the natural waterways it joined.

■ As the numerous exhibits demonstrate, the inlet wrought substantial and frequent changes in not only the Deep Hole Creek, Broadkill River, barrier beach land, and mainland in the immediate area of the jetty, but also the shore bordering the Delaware Bay south of the inlet. To conclude, as Layton suggests, that none of these changes altered property rights and boundary lines would be untenable especially since a determination of the 1907 boundaries and corresponding property rights would be most difficult. Inlets, perhaps more than any other artificial waterways, can substantially change adjacent land and watercourses, and as navigable waters, title to the bottom land would ordinarily be in the State. Certainly, the fluctuations in land and waterways brought about by erosion and accretion must be held to alter boundary lines. Thus, although originally constructed by the Government and not by the process of natural erosion, the inlet had the attributes of a natural waterway linking the bay and the Broadkill River. In spite of the presence of the jetty, the inlet must be treated as a natural waterway.

Secondly, Layton contends that the United States owned 5.8 acres of land presently included in the Broadkill Inlet alluvion, and the Government could not lose title thereto by the action of the inlet's waters. Thus, Layton argues, that she is the owner of this acreage as a result of her 1957 purchase of it from the Government. Acknowledging that if a private individual had constructed the jetty and inlet then Island Farm could have obtained riparian rights thereto by prescription, Layton, nonetheless, maintains that since no one can gain prescription rights against the Government, Island Farm can claim no private right to access to the Bay.[80] A comparison of LX–4C and the FX–16(3) [3] overlay show that a substantial portion of the Broadkill Inlet covered ground outside

---

75. Delaney v. Boston, supra.

76. 56 Am.Jur. "Waters", § 151; see Farnham, supra, § 827b.

77. Id.

78. 56 Am.Jur. "Waters", § 151, and cases cited therein under footnote 15.

79. Farnham, supra, § 827b.

80. Layton relies on 55 A.L.R.2d 576, Anno., § 12; 25 Am.Jur.2d, "Easements & Licenses", § 41; Stull v. United States, 61 F.2d 826 (8th Cir. 1932). United States v. Cardinale Warehousing Corp., 65 F.Supp. 760 (D.N.J.1946), to support her contention that no rights of a prescriptive nature can run against lands owned by the Government.

the Government's 5.8 acres.[81] Presumably, this acreage would have been subject to Island Farm's gaining riparian rights and subsequently title thereto through accretion. This leads to the anomalous result that Island Farm could have riparian rights to one portion of the inlet, that outside the 5.8 acres, and no such rights to another portion, that covering the Government's initial acreage.

The thrust of this second argument goes to the allegation that Broadkill Inlet was an artificial waterway and, therefore, not subject to the same rules of law that govern natural waterways. It is clear that on natural waterways the processes of erosion and accretion change title to public, as well as, private lands.[82] The Court is of the opinion that in the Broadkill Inlet area, the Government could and did lose title to any land eroded away by the actions of the inlet, or dredged to establish the navigable channel. Since the Government retained title to the jetty, it could, also, benefit from any subsequent accretions thereto as a result of the closure of the inlet. However, the Government, like Layton, would not obtain title to any lateral accretions south of the jetty so as to eliminate Island Farm's riparian access.

Finally, Layton asserts that several ponds and a narrow creek separated Island Farm from a substantial portion of the alluvion. This absence of contiguousness, she argues, precludes Island Farm from claiming title to the accretions.[83] As has been seen previously in *Waring* and *Rondesvedt*, the requirement that an alluvion be contiguous is not absolute and may be avoided when a court must do so to maintain an individual's riparian boundary.[84] The circumstances of this case and the reasons for not requiring contiguousness are similar to those in the cases cited above. Therefore, the presence of the few small ponds and narrow creek did not preclude Island Farm from gaining title to the alluvion.

Finally, the fact that the initial erosion and subsequent accretion are the result of the action of a third party, the Government, does not preclude either defendant from obtaining title to subsequent accretions.[85]

Having concluded that Island Farm is entitled to the accretions which formed in front of that portion of its boundary which was immediately riparian to the Broadkill Inlet and the Delaware Bay, the Court must ascertain the extent of this riparian boundary.

The Court holds that 1936, when Draper purchased Island Farm, is the pertinent date for this determination.[86] 1936 was the date at which Draper would have ascertained the land's riparian border and the extent of his unimpeded access to the Bay. Draper would be protected from any reduction of this boundary subsequent to his purchase under the rules discussed previously governing titles to accretions.

---

81. Even if LX–4C has not positioned the 5.8 acre parcel correctly, the alluvion consists of considerably more than 5.8 acres and must include some land outside the Government's parcel.

82. 56 Am.Jur., "Waters", § 492; Arkansas v. Tennessee, 397 U.S. 88, 90 S.Ct. 787, 25 L.Ed.2d 73 (1970); Mayor, Aldermen and Inhabitants of City of New Orleans v. United States, 10 Pet. 662, 35 L.Ed. 662, 9 L.Ed. 573 (1836); United States v. 11,993.32 Acres of Land, etc., 116 F.Supp. 671 (D.N.D.1953).

83. Layton relies on Anderson-Tully Co. v. Tingle, 166 F.2d 224 (5th Cir. 1948)

cert. denied, 335 U.S. 816, 69 S.Ct. 36, 93 L.Ed. 371 (1948).

84. 56 Am.Jur., "Waters", §§ 480, 485 (1947).

85. St. Clair County v. Lovingston, supra, 90 U.S. 66, 68, 69; Burns v. Forbes, 412 F.2d 995, 997 (3rd Cir. 1969); 56 Am.Jur., "Waters", § 486.

86. The Court chooses the date of Draper's purchase since the transfer from Draper to Island Farm was more a change of form rather than substance. Further, since Draper transferred the land to Island Farm within four months of the date of purchase, it is unlikely that any significant change had occurred.

It is possible that Island Farm's riparian border became longer subsequent to 1936 as erosion continued to reduce Layton's southern parcel;[87] however, Island Farm should not obtain title to the alluvion in front of any land made riparian to the Delaware Bay after 1936. This conclusion creates the possibility that the closure of Broadkill Inlet reduced the extent of Island Farm's eventual riparian access. This occurrence, of course, contradicts the theory upon which the allocation of the rest of the alluvion is premised, the preservation of one's riparian boundary. Nonetheless, courts have frequently acknowledged the difficulty in establishing an absolute rule to govern allocation in all circumstances,[88] and in light of the specific and particularized facts of this case, the Court is of the opinion that this result best compromises the conflicting policies governing title to accretions. The result preserves Island Farm's riparian rights as of the date of purchase, the date at which Draper could have ascertained his riparian access, and precludes Island Farm from extending its riparian border at the expense of Layton, while Layton was bearing all of the risk of erosion and in a position to receive none of the benefits of subsequent accretions.

Since there is no photograph or testimony indicating the 1936 situation, the length of Island Farm's riparian boundary on the inlet and the bay must be estimated as closely as possible from the exhibits and photographs depicting the area between 1932 and 1938.[89]

■ Using the scales on FX–21 and FX–15, the distance between the southern terminus of the jetty and the northern edge of the southern Layton parcel, and therefore, the length of Island Farm's riparian boundary to the bay, is approximately 575 feet. This figure is the best estimate available on the present record and must suffice for the limited purposes at issue herein.

Thus, Island Farm owns all of the alluvion between the Delaware Bay and the Government's arbitrary line situated between two parallel lines running generally east-west,[90] one intersecting the southern terminus of the jetty and one 575 feet further south. Island Farm also owns all of the land west of the Government's arbitrary line between the two parallel lines extended west.[91]

■ The third area in dispute consists of the line below the intersection of the Government's arbitrary straight line and the southern parallel line described above. In this area, Layton and Island Farm were separated by a channel connecting the Broadkill Inlet and River. As a navigable waterway, the channel represented the boundary of both defendants and each held title to the low water mark.

■ The channel closed by the process of accretion,[92] and under the rules and procedures discussed regarding the first area, each defendant would have title to the mid-point of the final channel.[93] As a comparison of the 1943 and 1954 photo-

87. Compare FX–19B (1943) and FX–23 (1938). Since the scales and tidal postures are not known no conclusive comparison can be made. However, the later photograph seems to show that the Layton southern parcel has been further eroded.

88. Stark v. Meriwether, 98 Kan. 10, 157 P. 438 (1916); Malone v. Mobbs, 102 Ark. 542, 145 S.W. 193 (1912); Hubbard v. Manwell, 60 Vt. 235, 14 A. 693 (1888).

89. These exhibits include FX–23 (1938 photo); FX–21 (1932 U. S. Engineer Chart); FX–16(1) (1933–1936 photo); FX–15 (U. S. Coast and Geodetic Chart).

90. In fact, these parallel lines run more north-east to south-west, and the second is to the south-east of the first, but for purposes of this opinion the directions in the text have been substituted. See footnote 5.

91. See Appendix II.

92. Draper testimony, Tr. 32–33, 87–89, 91, 95, 102.

93. See discussion in text accompanying footnotes 25–34.

graphs demonstrates, a portion of the area closed in the intervening years. The 1954, 1960 and 1968 photographs show what appears to be the southern terminus of the channel still open for a small distance, but in the process of gradually filling in. The 1968 photograph, FX–22, indicates that prior to the construction of the Thompson ditch, there existed a narrow creek of approximately 350 feet in length. The Court concludes that this represents the best evidence of the final channel separating the two defendants in that area, and that the center line of that 1968 creek marks the boundary between the parties. Since this line lies east of the condemned land, Island Farm is its owner and entitled to the compensation for all land inside the Government's taking in the area west of that 350 foot boundary line. On the basis of Tornstrom's calculations,[94] there is approximately 1.2 acres of Island Farm property outside of the condemned parcel in this segment.

■ There still remains approximately 300–350 feet of the Island Farm-Layton boundary not demarcated. Unfortunately, this area closed between 1943 and 1954 and there is no photograph in evidence which indicates the location of the final closure. However, the 1943 photograph reveals an alluvion building westward from the Layton southern parcel. As has been discussed previously, this area was most likely the first to close as this alluvion and perhaps accretions to Island Farm's eastern bank joined. The Tornstrom line represents the Government's demarcation of the area of final closure, and Mr. Pearson testified that a depression such as the one discovered by Tornstrom will often evidence the last place to fill in when a waterway closes.[95] Since the Tornstrom line in this area is located approximately where the alluvion from Layton's southern parcel would have met Island Farm's land had this accretion continued, the Court accepts the Tornstrom line as the best evidence of the final closing point of the channel in this area, and as the Island Farm-Layton boundary.[96]

The Tornstrom line in this area lies to the east of the line joining Points 9 and 10 except in one area where approximately .3 acres of land east of the Tornstrom line is west of the Government's line. This land, therefore, belongs to Layton, and she is entitled to any award made for that acreage.[97]

## SUMMARY

■ On the basis of the available evidence, the Court is of the opinion that with the exception of a total of approximately 1.3 acres, one acre north of the jetty and three-tenths of an acre near Point 10, all of the condemned land belongs to Island Farm. Layton is, of course, owner of the remaining 1.3 acres. In addition, Island Farm owns three parcels of land outside the land taken by the Government. Two are small parcels of .3 and 1.2 acres, one north of the jetty and the other adjacent to Point 10. The third piece of land joined the condemned land to the Delaware Bay, in the manner described previously, and gave Island Farm approximately 575 feet of frontage thereon. The two defendants will, therefore, be entitled to the monies paid for their respective parcels and the commission shall calculate the appropriate compensation on the basis of this decision.[98]

Submit order in accordance herewith.

94. For this and subsequent measurements and parcels hereinafter referred to see LX–7.

95. Tr. 525.

96. The two problems raised regarding the Court's reluctance to accept the Tornstrom line elsewhere, 1. the presence of the Thompson ditch, and 2, the overflow from Deep Hole Creek, are not present in this area. See FX–19(c), FX–22; LX–4A.

97. See Appendix II.

98. See Appendix II for present Island Farm-Layton boundary.

APPENDIX I Broadkill Inlet and adjacent lands and waterways
 in 1932 - 1943 period.

[A4547]

Delaware Bay

Jetty

Layton (North)

Broadkill Inlet

Deep Hole Creek

Island Farm

Layton (South)

Broadkill River

N
E
S
W

APPENDIX II Broadkill Inlet, alluvion and adjacent area at
present with Island Farm - Layton boundary as
determined herein.

[A4548]

