449 A.2d 250 (1982)
Emmons B. PHILLIPS and Mae T. Phillips, husband and wife, and Blaine T. Phillips and Janet Cozart Phillips, husband and wife, Defendants Below-Appellants, Cross Appellees,
v.
The STATE of Delaware, upon relation of the DEPARTMENT OF NATURAL RESOURCES AND ENVIRONMENTAL CONTROL and the Department of Highways and Transportation, formerly The State Highway Department, Plaintiff Below-Appellee, Cross Appellant.
Supreme Court of Delaware.
Submitted: June 23, 1982.
Decided: August 5, 1982.
Nicholas H. Rodriguez (argued) of Schmittinger & Rodriguez, Dover, for defendants below-appellants, cross appellees.
William H. Sudell, Jr. (argued) of Morris, Nichols, Arsht & Tunnell, Wilmington, for plaintiff below-appellee, cross appellant.
Before HERRMANN, C. J., HORSEY, J., and CHRISTIE, Judge.
*252 HERRMANN, Chief Justice:
In this appeal, the defendants, Emmons B., Mae T., Blaine T., and Janet C. Phillips, (hereinafter "the Phillips") seek reversal of Court of Chancery, 400 A.2d 299 decisions denying their claim of ownership to a 13 acre parcel of land fronting the Atlantic Ocean on Fenwick Island.
The Phillips assert that they own the disputed parcel on one or more of the following grounds: (1) at least a part of it was included in ancient patent descriptions from the State to their predecessors in title  the balance, as foreshore, accruing to them under riparian law; (2) the occupation of the disputed parcel by them and their predecessors in title by adverse possession was open, notorious, hostile, and exclusive for 20 years or more; and (3) a presumed grant of the disputed parcel by the State has been shown. While asserting that a decision favorable to them on any one of those theories would be sufficient to carry the day, the Phillips contend in the alternative that if they do not prevail on their ownership claim, they are nevertheless entitled to compensation for services rendered and moneys expended which, they assert, increased the value of the land.
We address each of the Phillips' contentions seriatim.

I.

A.
The patents issue was addressed by the Court of Chancery in an unreported opinion, State v. Phillips, C.A.No. 276 (1976),[1] on the Phillips' motion for summary judgment, in which it was concluded that the language of the patents did not, as a matter of law, show that the disputed parcel passed to the Phillips' predecessor in title.[2]
The substance of the Phillips' position is that the "on the beach" and "along the beach" description language in the patents leads to the conclusion that the easterly boundaries run to the high water mark along the Atlantic Ocean  this because the word "beach" means the "land between the high and low water marks." It would follow that if they own to the high water mark, under Delaware riparian law, they would own to the low water mark. State ex rel. Buckson v. Pennsylvania Railroad Co., Del.Supr., 267 A.2d 455 (1969). The Court of Chancery correctly stated, "The question presented is simply whether the word `beach' as a matter of law in every context, and in this particular context, means the land between high and low water marks."
In Pennsylvania Railroad Co., supra, this Court held that "shore" meant the area between the high and low water mark. The Phillips argue that "beach" and "shore" are synonymous and, therefore, the references in the patents to "beach" mean "shore," thus placing the eastern-most *253 boundaries of the patents at the low water mark and the land in dispute within their chain of title.
In construing words in any conveyance, it is the intent of the parties, particularly the grantor, which controls. Rohner v. Niemann, Del.Supr., 380 A.2d 549 (1977); Maciey v. Woods, Del.Supr., 154 A.2d 901 (1959). The language must be considered as a whole and within context. Aiken v. Clark, 117 Vt. 391, 92 A.2d 620 (1952); Latchis v. John, 117 Vt. 110, 85 A.2d 575 (1952). The rule of construction favoring the grantee is not applicable to grants from government. City of Passaic v. State, 33 N.J.Super. 37, 109 A.2d 294 (1954); 23 Am.Jur.2d, Deeds § 166 (1965).
In determining the intended meaning of the word "beach" in the patents, we must view it within its contextual framework. "The word `beach' has no such inflexible meaning that it must [always] denote land between high and low water mark." Merwin v. Wheeler, Conn.Supr.Ct. Errors 41 Conn. 14, 26 (1874).
We turn, therefore, to the specific language of the grants in question. The first, the so-called "Salt Meadow Patent," provides in relevant part:
"Beginning at a post standing on the Beach: Thence North eighty-four degrees West, twenty-two perches from a post the Beginning Bounder of Fowles Delight on the East side of a small Bay called Assawamman Bay near Cherry Bush opposite the Main Land; thence North eighty-four degrees West, seventy-six perches to a post at the above said Bay' thence with said Bay North five degrees West twenty perches to a post; thence North fifty-one degrees East sixteen perches to a post, at the mouth of a Gut; thence East, forty-eight perches to a post; thence South twenty-three degrees East, forty perches to the first bounder. Containing twelve and three-quarters acres of land and marsh. And allowance of six percent ... with the appurtenances. To Have and to Hold the said tract of land, with the appurtenances, to him the said John Dazey, his heirs and assigns forever, as his and their absolute and unconditional estate and property free and clear of all reservations and services whatsoever." (emphasis added)
The second, the so-called "Comforts Pasture" patent provides in pertinent part:
"... to the east side of a broad gut, thence South eighty-nine degrees West forty eight poles, South four poles to John Dazeys heirs land, thence with ditto North eighty-nine degrees east forty-eight poles, South twenty-five degrees East forty-two poles to the Bounder of John Dazeys heirs land [This corresponds with the beginning bounder for `Salt Meadow'], thence North sixty four degrees East, three poles along the Beach..."
"the appurtenances, unto him the said Jesse Dazey his heirs and assigns forever, as his and their absolute and unconditional Estate and Property, free and clear from all Reservations of rents and services whatsoever...." (emphasis added)
It is clear that the emphasized language in the Salt Meadow patent notes a beginning point the location of which does not fix a boundary adjacent to the ocean. This is evident from the reference to the "Fowles Delight" patent. The description of that patent[3] calls for a beginning point "about a quarter of a mile from the sea." The Salt Meadow patent relates to Fowles Delight at a point 22 perches or about 330 feet west of the latter's eastern boundary. Assuming, because of the dynamic and changing nature of the area, that the Fowles Delight eastern boundary is the foreshore, then Salt *254 Meadow begins over 100 yards west of that boundary. As concluded by the Court of Chancery, "it is clear from the description that the Salt Meadow beginning is a considerable distance further away from the ocean than the beginning point of Fowles Delight."[4] We agree and hold that "beach" in the Salt Meadow description was not intended to be synonymous with "shore."
As to the Comforts Pasture patent: the description makes only one reference to "beach," that is along a line of about 50 feet at a sharp angle to the Ocean. It seems more likely that had it been intended for the description to include the foreshore, the line would have paralleled the Ocean, not run at a sharp angle thereto.
Relative to the Comforts Pasture tract, the Court of Chancery found that:
"* * * in the certificate and plot of Comforts Pasture and the September 7, 1814 survey, near the very line on which the defendants rely there is noted to the east of Comforts Pasture the words `sand and beach' .... [T]he same plot shows to the east of Comforts Pasture, approximately midway in the plot, that Comforts Pasture is bounded on the east by `Vacant Beach'."
We think it manifest, within the context of the descriptions in the patents, that no intent to convey to the foreshore can be gleaned from the face of the patents as a matter of law. On the contrary, our conclusion, based upon the patent description language and context, is (1) that the word "beach" as used in the patents was not intended to mean the area between high and low water mark; and (2) that the Phillips' predecessors in title did not, by virtue of the patents, own to high water mark and thus to the low water mark under Delaware riparian law. In support of this conclusion, we endorse the following statement of the Court of Chancery:
"* * * nowhere in the descriptions of either of the two patents directly in issue or contemporaneously related documents is there any reference to the Atlantic Ocean. This absence is even more notable when contrasted with the prominence of the mention of Assawoman Bay. Indeed, it seems extremely unlikely that there would be mention of poles standing in tidal waters with the mentioning of the ocean itself. Again, not only does this omission suggest that the description of the land cannot be held ... to include a boundary on the Atlantic Ocean, it clearly suggests quite the contrary. This omission is highlighted by the fact that the descriptions are set forth in terms of degrees and distances with nothing to indicate that the line binds on water or follows a water course."
Accordingly, we affirm the Court of Chancery's denial of the Phillips' motion for summary judgment, 400 A.2d 299 on the patent facet of the case.[5]

B.
The Phillips further argue that foreshore is an appurtenance and since the patent descriptions granted appurtenances "free and clear from all Reservations," it must have been intended to grant down to and *255 including the foreshore by application of the principal of annexation.
While it may be assumed that foreshore is an appurtenance, Snow v. Mt. Desert Island Real-Estate Co., 84 Me. 14, 24 A. 429 (1891), it cannot be said that foreshore is limited to that appurtenant to an ocean. On the contrary, foreshore can be found along any tidal water. State v. Pennsylvania Railroad Company, Del.Ch., 228 A.2d 587 (1967) aff'd. 267 A.2d 455 (1969). Accordingly, giving due consideration to the express reference to Assawaman Bay, we think it more reasonable to conclude that any reference to appurtenances was intended to mean the foreshore along the Bay. This is supported by the 1929 Pepper Survey showing the western boundaries of both patents up to the waterline of the Bay.

II.
On the adverse possession claim, the State moved for summary judgment on the ground that such claim was prohibited by Statute. The applicable Statute,[6] 9 Del.L. 454, enacted in 1843, provided that adverse possession could be claimed against the State except for salt marshes; and after the 1852 amendment, the words "beach or shore" were added to the exception. In an opinion denying the State's motion for summary judgment, reported at 400 A.2d 299, the Court of Chancery held that in the context of the Statute, the words "beach" and "shore" were synonymous. The State has cross-appealed.
Assuming, arguendo, that the words "beach" and "shore" were intended to be synonymous and one could hold adversely down to the high water mark, we find that the Phillips did not prove facts at trial sufficient to assert a claim of adverse possession against the State.
The Statute permitting adverse possession was repealed in 1953. 49 Del.L. ch. 386. Therefore, possession would have had to begin by 1933. The Phillips family did not take possession until 1939. To support their claim by adverse possession, the Phillips, bearing the burden of proof, David v. Steller, Del.Supr., 269 A.2d 203 (1970), were obliged to show possession by their predecessors in title for at least 6 years.
The Court of Chancery found, after trial, that the Phillips had not met their burden of proof. We are not convinced that the Trial Court was "clearly wrong" in its findings of fact and inferences therefrom. Accordingly, we affirm this facet of the case. Warren v. Goldinger Bros., Inc., Del.Supr., 414 A.2d 507 (1980).
The Phillips' argument, purporting to create a question of law, is that the Trial Court imposed upon them too great a burden of proof  this because it accepted the State's evidence while ignoring much of theirs. The position is untenable. The Trial Court clearly and expressly applied the correct standard: a preponderance of the evidence. Milliken v. Buswell, Me.Supr., 313 A.2d 111 (1973).
The Court of Chancery found a failure to prove the element of intent to possess adversely. The absence of proof of that element, by a preponderance of the evidence, is fatal to the Phillips' claim. See Marvel v. Barley Mill Road Homes, Del.Ch., 104 A.2d 908 (1954).
Indeed, the contrary is evident from the facts. The record includes deed descriptions showing transfers of property among the various predecessors in title. None of the transfers included the disputed parcel, while all the transfers involve adjacent land. Had any of the Phillips' predecessors in title intended to claim the disputed parcel adversely, we think that intent would have been manifest in their transfers.
In fact, the only recorded manifestation of intent did not arise until 1959 when the *256 Phillips filed a quit claim straw deed asserting their claim, 6 years after the repeal of the Statute allowing adverse possession. The Phillips began paying taxes on the disputed parcel in 1960, but only as a result of having filed the 1959 quit claim deed.
As to other facts, the Trial Court found that the Phillips' predecessors in title engaged in such activities on the disputed parcel as hunting, gunning, fishing, trapping, oystering, and swimming. It found these to be merely "the same activities that any member of the public would likely engage in on public lands."
The Phillips assert that their predecessors in title and others took sand from the disputed parcel prior to 1933. However, presented with contradictory testimony, the Trial Court concluded that the evidence was inconclusive to prove the adverse possession claim.
A memo, introduced by the Phillips, written in 1949 by George A. Williams, a predecessor in interest, was found by the Trial Court to be more consistent with the State's position. A 1960 survey prepared for the Phillips was rejected because it moved the eastern boundaries nearer the ocean without justification.
The Trial Court's findings were the product of in depth "consideration of the documentary evidence and the testimony and [review of] credibility of `live' witnesses"; we do not find them "clearly wrong," Levitt v. Bouvier, Del.Supr., 287 A.2d 671, 673 (1972).
Accordingly, we affirm the conclusion reached by the Court of Chancery on the adverse possession facet of the case.

III.
As to the claim of presumed grant it has been said:
"The doctrine ... that the long continued possession of land by one claiming as owner gives rise to the presumption of a valid conveyance to him or to the person under whom he claims, though ordinarily similar in its practical results [to a claim of adverse possession], is entirely independent [from a claim of adverse possession]. It involves a presumption of the rightfulness of one's possession, while [adverse possession is] applicable only when the possession is ... wrongful." 4 Tiffany, Real Property § 1136 (3rd ed. 1939) [emphasis added]"
As noted by the Court of Chancery, 400 A.2d at 305, the doctrine is merely a presumption designed to quiet title to land in long possession. See Fletcher v. Fuller, 120 U.S. 534, 7 S.Ct. 667, 30 L.Ed. 759 (1887). The presumption is subject to rebuttal. "The presumption of lost grant may be rebutted or overcome by evidence of any inconsistent facts or circumstances tending to show the nonexistence of the presumed grant, such as by evidence of admissions of the occupant that there had been no grant; and where the presumption is raised by parol evidence; it may be rebutted by the same species of evidence." (emphasis added). 2A C.J.S., Adverse Possession § 326 (1972); see also, Waterman v. Moody, 92 Vt. 218, 103 A. 325 (1918).
We hold that the State has rebutted any presumption of a grant in this case. The grants among the Phillips' predecessors in title excluding the area in dispute are inconsistent with a claim of ownership. Such grants are tantamount to an admission that there has been no grant. That, coupled with the Pepper Survey showing the disputed parcel excluded from the grants to the Phillips' predecessors in interest, is fatal to their claim.

IV.
The Phillips assert that the disputed property was benefited by their activities and expenditures, and because the benefits improved the parcel, they are entitled to compensation for their efforts. The Trial Court found that: (1) the water wells, drainage system, driveway, and electrical system installed only benefited adjacent property; (2) the erection of boundary markers, sand barriers and trees were of minimal benefit since they were destroyed in a storm in 1962 and, furthermore, the trees were paid for by the State; (3) the survey and recordation of boundaries was of no benefit to the disputed parcel and was only self-serving to the Phillips; (4) the construction of a house did not benefit the *257 disputed parcel because the house was on adjacent property; (5) the remedy for erroneous payment of property taxes is found within 9 Del.C. § 8618; (6) efforts regarding reconstruction of dunes and relocation of a highway were not compensable benefits, the former being related only to relocating the dune line, the latter being constructed on other property; (7) prevention of a tax sale did not enhance the value of the disputed land; (8) prosecution of trespassers likewise did not enhance the value; (9) other activities related to the land in no way enhanced its value.
We agree with the findings of the Trial Court and, at the same time, note that as a matter of law there can be no claim for improvements absent a valid assertion of adverse possession. United States v. Burrill, Me.Supr., 107 Me. 382, 78 A. 568 (1910). Compare Schwebel v. Schwebel, Del.Ch., 107 A.2d 534 (1954). We also note the voluntary nature of the Phillips activity. See generally, Western Natural Gas Co. v. Cities Service Gas Co., Del.Supr., 201 A.2d 164 (1964).

* * *
Affirmed.
NOTES
[1] For earlier opinions holding that the disputed parcel passed from the heirs of William Penn to the State in 1776, see State v. Phillips, Del.Ch., 305 A.2d 644 (1973), aff'd sub nom. Phillips v. State, Del.Supr., 330 A.2d 136 (1974).
[2] Procedurally, the question presented was, whether the two patents on their face conferred on the grantees (the Phillips' predecessors in title) riparian rights as a matter of law, or whether the patents presented a triable issue of fact as to their eastern boundaries.
[3] The Fowles Delight patent provides in relevant part:

"Beginning at a marked cedar post standing about a quarter of a mile from the sea in a Large Marsh called the Old Inlett Marsh and on the South side of a Bay called Assawoman Bay and from the same North Eighty-four degrees West One hundred poles thence South five degrees East eighty poles thence South eighty degrees East One hundred poles and from thence with a right line to the first bounder. Containing fifty Acres more or less ... (emphasis added)."
[4] The Court of Chancery stated in this connection:

"Only the Salt Meadow patent's beginning point is stated to be `on the beach'; and its eastern boundary is not described as binding on the ocean, nor do any of the other points of reference in the patent refer to the beach or to the ocean. In contrast, the patent makes several references to the waters of `Assawoman Bay' as being the western boundary of the patent. Further, a plotting of Salt Meadow patent's description shows the beginning point as being the `extreme easterly point' of the entire tract. Finally, the plot of Comforts Pasture and its accompanying survey refers to `sand and beach' as lying to the east of that patent; and yet the Comforts Pasture patent lies entirely to the east (and north) of the Salt Meadow patent."
[5] Following trial on the merits in 1980, the Court of Chancery expressly found:

"No evidence adduced at the trial convinces me that the eastern boundaries of the Salt Meadow Patent and the Comfort's Pasture Tract Patent bind with the Atlantic Ocean and I therefore hold that they do not."
The Phillips' have not appealed this ruling on the merits.
[6] The Statute in question, including the 1852 amendment, provided in relevant part:

"Sec. 2. A continued, uninterrupted and peaceable possession of any land, other than salt marsh, beach or shore, for twenty years by any person, or by those under whom he claims, shall be a bar to any claim of title in the State to such land, although no patent or grant has been made for the same, and nothing paid to the State therefor. Ch. 2, Rev.C. 1852 (emphasis added)"